UNITED STATES of America, Plaintiff,

v.

**Richard TRABERT, Defendant.**

No. 97–1600M.

United States District Court,
D. Colorado.

Oct. 24, 1997.

Stephen G. Salerno, Special Asst. U.S. Atty., Aurora, CO, for Plaintiff.

Patrick Ridley, Richilano & Ridley, P.C., Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BORCHERS, United States Magistrate Judge.

THIS MATTER came before the Court for trial on October 14, 1997. Present were the following: Stephen G. Salerno, Special Assistant United States Attorney; Patrick Ridley, attorney for Defendant; and Defendant. The Court heard testimony from various witnesses and then continued the case for closing arguments by counsel. After those arguments were presented on October 17, 1997, the case was taken under advisement.

Defendant was charged with an alleged violation of the Privacy Act, pursuant to 5 U.S.C. § 552a(i)(1), for disclosing Fitzsimons Army Medical Center Orthopedic Patient Record information to a third party. He waived his right to have the matter heard by a United States District Judge, and consented to a trial before a United States Magistrate Judge. Because Defendant did not face any possible incarceration as a penalty, he did not have the right to a jury trial.

## I.

This case is one of first impression. The Court will detail all testimony presented during the trial.

**A. Prosecution Witnesses and Evidence:** The prosecution presented four witnesses in its case-in-chief. It then presented three witnesses in rebuttal.[1]

*Nile Neves:* Mr. Neves worked at the Fitzsimons Army Medical Center (FAMC) located in Aurora, Colorado. This center had been a major medical facility for the United States Army, but the decision was made in 1995 to close the facility as part of the overall reduction in the size of the military. At the time the alleged violation occurred, FAMC was in the process of closing. That process has concluded now, as almost all medical operations have been transferred or terminated. The facility is now known as the United States Army Garrison—Fitzsimons. Total closure of military operations is scheduled for the year 2000. The Court will refer to the facility as FAMC.

Mr. Neves held a position in the Directorate of Information Management (Directorate) until June, 1996. The Directorate was responsible for computer processing and upkeep. Mr. Neves testified that he had come to know Defendant through his work at FAMC. Specifically, Mr. Neves worked on computers in various clinics and had met Defendant who was then the administrator of the Orthopedic Clinic.

Mr. Neves testified that at some point in March or April, 1996 Defendant requested that the Directorate prepare a computerized list of patients seen in the Orthopedic Clinic. This request was not uncommon at that time, as other clinics had made similar requests. Mr. Neves indicated that he had no concerns about the request from Defendant and began the work to complete the report.

The report proved to be voluminous. *See* Prosecution Exhibit 1. The list contained over twenty-two thousand names and took two days to print. The list contained the names of all patients who had received care

---

1. The Court accepted offers of proof on all or part of the anticipated testimony of rebuttal witnesses.

in the Orthopedic Clinic since 1990, the home addresses of the patients, and were grouped by treating physician. Some of the names of patients were duplicated, as those patients had been under the care of more than one doctor at the Clinic. Mr. Neves testified that he had contacted Defendant to advise him that he was working on the list but that it would take some time.

Mr. Neves was asked on direct examination concerning the training necessary at FAMC before a password to the computer would be assigned to a person. Mr. Neves indicated that such training provided discussion concerning the Privacy Act, 5 U.S.C. § 552a, and that he had to sign a Privacy Act Statement before being granted access to the computer. He further testified that a banner appeared on each computer screen advising that data in the system was covered by the Privacy Act.

On cross-examination, Mr. Neves indicated that he could not remember the exact date on which Defendant had made the request for the list. Defendant had advised Mr. Neves that the list was to be used by the Orthopedic Clinic (Clinic). The list did not contain any information on medical treatment, diagnosis, or related matters. No Social Security or telephone numbers were on the list.

Mr. Neves indicated that Defendant had advised him that a mailing list would be generated from the list. There was no Privacy Act warning on the list.

*Richard McMullen:* Mr. McMullen testified that he currently is in contract management for CHAMPUS in Fort Collins, Colorado. He testified that he previously was the manager for the Orthopedic Clinic at University Hospital at the University of Colorado Health Sciences Center.

Mr. McMullen testified that he began at University Hospital in March, 1996 and left

in March, 1997 for his present job. Mr. McMullen testified that on a date in April, 1996 he went to the Clinic at FAMC. Mr. McMullen had not scheduled an appointment, but went to the Clinic to see Lieutenant Colonel (LTC) Edward J. Lisecki. Dr. Lisecki was the physician in charge of the Clinic.[2] Mr. McMullen testified that Dr. Lisecki was "coming over to the Hospital" after FAMC closed.

Mr. McMullen testified that he met Defendant for the first time when he appeared at the Clinic. Mr. McMullen indicated that the two talked about their respective clinics and how each was run. The testimony of Mr. McMullen indicated he had been advised that a list of patients was to be provided to him to take back to University Hospital. He inquired about the list, and Defendant went and retrieved the list. Prosecution Exhibit 1. Mr. McMullen stated that he picked up the list and took it with him to the Orthopedic Clinic at University Hospital.

Mr. McMullen testified that he advised the chief of his clinic that he had the list. The list remained in Mr. McMullen's office and nothing was done with it. Dr. Lisecki then contacted Mr. McMullen's superiors and a decision was made to put the information into a computerized data base. A temporary employee was hired to place all of the information in the computer system at University Hospital, since the information was unavailable by disk from the Directorate. About $5,000 was spent by University Hospital for the placement of the data into the computer system.

Mr. McMullen indicated that he had talked with Dr. Lisecki who stated that the list was prepared to allow "continuity of care." At the time Mr. McMullen obtained the list, University Hospital was being considered for a contract with CHAMPUS that would involve providing services for those patients

---

**2.** On August 6, 1996, Dr. Lisecki and his wife, also a physician and commissioned officer in the United States Army Medical Corps, were charged with various violations of the Uniform Code of Military Justice. Both were convicted after a general court-martial. Dr. Lisecki received a punishment of forty-five days imprisonment, but did not receive a dismissal. He remains on active duty as a physician at Evans Army Hospital, Fort Carson, Colorado, though his retirement is imminent. Dr. Lisecki's wife received a dismissal from the court-martial. A dismissal for a commissioned officer is the equivalent of a dishonorable discharge for an enlisted member of the Armed Forces.

who would have continued to receive care at FAMC, had it not closed.

On cross-examination, Mr. McMullen testified that it was general knowledge that Dr. Lisecki was coming to University Hospital. Mr. McMullen had talked with Dr. Lisecki about making the transition to University Hospital and providing continuity of care for patients. Mr. McMullen indicated that he had gone to FAMC specifically to see Dr. Lisecki in April, 1996. It was by chance that he met Defendant.

Mr. McMullen had been told by Dr. Lisecki that the list had been prepared. When Dr. Lisecki was not available, Mr. McMullen indicated to Defendant that "I might as well take the list with me." Mr. McMullen testified that he saw no problem in taking the list with him at that point. He later advised Dr. Lisecki that he had obtained the list. Dr. Lisecki showed Mr. McMullen a letter that was going to be sent to patients. Defendant's Exhibit C. That letter was going to be mailed to all patients on the list. Mr. McMullen testified that he had no further discussions of any sort with Defendant after the meeting in April, 1996, though both met briefly during Dr. Liescki's court-martial.

*Scott Matthews:* Mr. Matthews testified that he is the Department Administrator for the Orthopedic Clinic at University Hospital. Mr. Matthews testified that he had talked over the telephone with Defendant for a couple of years before he met him. Mr. Matthews was aware Defendant was trying to obtain employment at University Hospital because of the closure of FAMC.

Mr. Matthews indicated that attempts were made to find employment for Defendant, but he lacked the educational requirements for an administrative position. Defendant did not have a bachelor's degree at the time of his application for work in Fall, 1995. Mr. Matthews testified that he talked with Dr. Jerome Wiedel, M.D., Chief of the Orthopedic Clinic at University Hospital, and with Dr. Lisecki about the possibility of waiving educational requirements for Defendant, but Defendant was not privy to those conversations.

The list was received by Mr. Matthews from Mr. McMullen. Over twenty-two thousand names were entered into University Hospital's computer system. The computerized list was to be used to send out a mailing to all of Dr. Lisecki's patients by utilizing the data from the list. Legal counsel for University Hospital later advised the Orthopedic Clinic that the list was private and should be destroyed. Mr. Matthews indicated that the data from the list was removed from the computer system.

On cross-examination, Mr. Matthews testified that he had talked with Dr. Lisecki in December, 1995. The relationship between FAMC and University Hospital had been close, as there were shared programs for residents and interns. Dr. Lisecki had a faculty appointment at University Hospital and oversaw the work of orthopedic residents when they did a rotation at FAMC. Faculty members at University Hospital did rounds at FAMC, as did military physicians at University Hospital.

Mr. Matthews testified that Defendant had interviewed for the job Mr. McMullen received in March, 1996. This was prior to any list being received at University Hospital.

*James Powell:* Mr. Powell testified that he is the Chief of Information Services at United States Army Garrison—Fitzsimons. He previously worked for the Directorate at FAMC.

Mr. Powell indicated that he was thoroughly familiar with the Fitzsimons Hospital Information System. This was the computer system established at FAMC for patient information and related matters. The system was not accessible by all employees. Before any employee was allowed access to the system, there was mandatory training. This included information on the Privacy Act. Upon completion of training, each individual would be required to sign a Privacy Act Statement. This included Defendant. Prosecution Exhibit 3. Individuals who received access codes for the system would be limited to those areas to which they needed access.

Mr. Powell stated that Defendant had last accessed the system on July 11, 1996. Defendant's access code had been terminated,

as he was no longer an employee of FAMC. On cross-examination, Mr. Powell indicated that he was not aware of Defendant's use of the system. However, Mr. Powell was familiar with the list, as he had helped prepare it. He testified that other lists also had been prepared for other clinics.[3]

**B. Defendant's Witnesses and Evidence:** Defendant presented one witness and then testified in his own defense.

*Sharon Devonshire:* Ms. Devonshire testified that she is presently employed at Fort Carson, Colorado. She previously was employed at FAMC and was Chief of the Records Branch. She had held this position since 1991. One of her duties was to insure compliance with the Privacy Act.

Ms. Devonshire indicated that she conducted and coordinated training on the Privacy Act while at FAMC. She also was responsible for conducting audits under the Privacy Act to insure that various clinics, departments, and other parts of FAMC complied with the Act.

Emphasis had been placed on protection of hard copy data, such as treatment records. Everyone who worked at FAMC, both military and civilian personnel, was advised never to release a Social Security number. Ms. Devonshire indicated that she knew Defendant from her work at FAMC but was unaware of what training he had received concerning the Privacy Act.

Ms. Devonshire testified that she had conducted an audit of the Surgery Clinic when Defendant was working there. She did not recall any major problems.

Ms. Devonshire indicated that there was confusion in all parts of FAMC due to the base closure. She received many inquiries, including some from patients, concerning records. Ms. Devonshire testified that patients were authorized to receive copies of medical records, but that the originals belonged to the United States Army. There was confusion as to the prospect of University Hospital taking over the facility and receiving a contract to provide services to those who had been treated at FAMC.

Ms. Devonshire testified that she believed the release of any name or address of any patient violated the Privacy Act. She believed everyone should have known about the privacy of medical records.

On cross-examination, Ms. Devonshire testified that she also worked with the Freedom of Information Act (FOIA). There were requests received under FOIA for patient lists. Any questions as to the availability of documents under FOIA were referred to the Office of the Staff Judge Advocate. She testified that she was not asked about the list Mr. McMullen had picked up at the Orthopedic Clinic. She indicated that the list should not have been given to anyone outside of FAMC.

She indicated that training on the Privacy Act was provided to both military and civilian personnel at FAMC. Training included a movie, but that movie was directed more toward military personnel issues than for those who were retired or civilians.

Ms. Devonshire testified that she would have prepared a memorandum for record if she had been directed by a superior to turn over any documents to a third party. She indicated on redirect that some employees might have followed the directives of superiors without preparing a memorandum.

*Defendant:* Defendant testified that he presently is working in hospital administration. He served on active duty with the United States Army from 1969 through 1989. He retired in the rank of First Sergeant. After retirement in 1989, he was employed at FAMC as a civilian.

Defendant testified that he became the administrator for the Orthopedic Clinic in the early 1990's. In April, 1996, he also became the administrator for the entire Department of Surgery. His responsibilities included handling personnel to insure that all duties were performed for the Clinic. He hired and fired clerical personnel in the Clinic.

During the time Defendant was administrator at the Clinic, Dr. Lisecki was the head of Orthopedics. Defendant reported to Dr.

---

**3.** Defendant made a motion for judgment of acquittal at the conclusion of the prosecution's case and at the conclusion of all evidence. The motion was deferred pursuant to Fed.Crim.P.29(b).

Lisecki, an individual whom he had first met in 1979 while on active duty. The Clinic had twelve residents in training, and Dr. Lisecki was responsible for overseeing their work, as well as the work of staff military physicians.

Defendant testified that he did not deal routinely with medical records. A patient's records would be secured from the medical records office prior to an appointment in the Clinic and then returned after the appointment was concluded. Medical records were not stored in the Clinic.

Defendant testified that with the impending closure of FAMC there was concern among the medical staff for care of patients who had previously depended upon the Clinic. Defendant testified that he was directed by Dr. Lisecki to secure from the Directorate a list of all orthopedic patients. This directive came after the data base available to the Clinic proved unworkable.

Defendant indicated that he talked with Mr. Neves after being directed to get the list. Defendant told Mr. Neves that Dr. Lisecki wanted the list for a mailing. Defendant later picked up the list and took it back to Dr. Lisecki. Defendant was not told by anyone at the Directorate that the list was restricted under the Privacy Act.

Dr. Lisecki then asked Defendant to prepare a mailing list from the information provided by the Directorate. Defendant advised Dr. Lisecki that he did not have the staff or resources to make such a list. Dr. Lisecki told Defendant that he would talk with people at University Hospital to see if the hospital could help.

Defendant testified that Mr. McMullen simply appeared at the Clinic. Both talked for some time, and then Mr. McMullen indicated that he should take the list. Defendant then retrieved the list from Dr. Lisecki's office and gave it to Mr. McMullen. Defendant testified further that he did not believe he had done anything wrong, as Dr. Lisecki had told him that the list would be turned over to University Hospital to allow the preparation of a mailing list. Defendant indicated that he was well aware that Dr. Lisecki would be going to University Hospital after his retirement from the service.

Defendant testified that he did not recall any specific training under the Privacy Act over the last few years. He did not contact Ms. Devonshire concerning any Privacy Act considerations. Dr. Lisecki did not indicate any concerns about the Privacy Act.

On cross-examination, Defendant testified that he had been given the Military Occupational Specialty (MOS) of 71L, Administrative Specialist. He had received training over the years on medical records and had worked in the medical field for some time. He did not recall any training concerning the Privacy Act as it related to medical records.

Defendant stated that he had taken the training necessary to be given an access number to the computer system. Defendant testified that continuity of care was a "hot issue" in the Clinic.

On redirect examination, Defendant testified that he had never been given a copy of the Privacy Act nor been instructed to read it. He testified that he did not believe the list to contain medical records, as there was no information concerning treatment, diagnosis or the like on the list.

On re-cross examination, Defendant testified that the list did provide the name of the treating physicians. He testified that he was not directed to secure any additional lists.

**C. Prosecution Rebuttal Testimony:** The prosecution presented three rebuttal witnesses:

*Charles Terry:* Mr. Terry testified that he worked at FAMC for some period of time, though he was no longer working for the government. He testified that efforts were being made to provide continuity of care for all FAMC patients. Various meetings were set up, and information was provided to patients concerned about their care.

*James Dye:* Mr. Dye testified that he presently is the Protocol Officer at United States Army Garrison—Fitzsimons. He previously was employed as an administrative officer at FAMC.

Mr. Dye testified that he knew Defendant. He held the same MOS as Defendant and received Privacy Act training. He continued to receive training on the Privacy Act after

retirement from the United States Army. He testified that he would not have provided the list to anyone outside of FAMC.

On cross-examination, Mr. Dye acknowledged that he had received most of his training on the Privacy Act in 1974–75. This was just after the Act became law.

*Richard Bursell:* Lieutenant Colonel (LTC) Bursell testified that he was the Staff Judge Advocate at FAMC. He is on terminal leave and will be retiring shortly from the United States Army.

LTC Bursell testified that he held a meeting on March 13, 1996 with Dr. Lisecki, Colonel Bennion, and Colonel Cole. Bennion and Cole held medical positions at FAMC and were part of the medical chain of command. LTC Bursell had set up the meeting because he had been advised that Dr. Lisecki was contemplating employment with University Hospital. LTC Bursell was concerned that Dr. Lisecki was planning to take research projects with him to University Hospital. During the meeting, Dr. Lisecki acknowledged that he was having employment negotiations with University Hospital. LTC Bursell testified that he advised Dr. Lisecki of the provisions of 18 U.S.C. § 205 dealing with conflicts of interest and advised Dr. Lisecki that he should not be involved in any decisions related to matters in which University Hospital might be involved or affected. LTC Bursell also advised Dr. Lisecki to make known his disqualification on any matters dealing with University Hospital.

On cross-examination, LTC Bursell testified that Defendant was not at the meeting on March 13, 1996. He said that his only contact with Defendant came at a meeting on October 3, 1996 when LTC Bursell talked with Defendant in his office concerning various matters relating to Dr. Lisecki.

In response to questions from the Court, LTC Bursell indicated that Dr. Lisecki had been directed to provide disqualification statements on matters where there was a conflict. LTC Bursell indicated that he did not follow up to see if such statements had been provided.[4]

## II.

Defendant has been charged with a criminal violation of 5 U.S.C. § 552a(i)(1). Counsel indicated that they could find no reported cases under this section. The Court also has looked and has found none.

The section at issue reads as follows:

Criminal penalties.—Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.[5]

The parties have acknowledged that the Department of the Army has promulgated a regulation pursuant to this statute. *See,* Army Regulation 340–21. Defendant's Exhibit B.

There was dispute during the trial as to the standards required by this statute. There was and is no dispute that Defendant was an employee of an agency under the Privacy Act and that he had access to agency

---

4. Defendant made an oral motion for dismissal or mistrial prior to closing arguments on October 17, 1997. Counsel argued that it was improper for the prosecution to have called LTC Bursell, since he was the prosecutor's superior and a member of the Office of the Staff Judge Advocate at FAMC. At the time of the decision to charge Defendant, the Office of the Staff Judge Advocate had three uniformed lawyers, plus a civilian lawyer who handled medical malpractice matters. Mr. Salerno handled this case as a Special Assistant United States Attorney pursuant to an agreement with the United States Attorney for this District. The Court does not need to reach the issue of the propriety of testimony by LTC Bursell, but it perhaps would have been better for this case to have been referred directly to the United States Attorney or his designee for prosecution.

5. The prosecution has maintained that this section carries no possible term of imprisonment. The Court has treated this case as one not involving any possibility of imprisonment.

records pursuant to his employment. There is no dispute that the list was provided to Mr. McMullen. There was dispute as to other provisions of the statute. Each will be reviewed separately.

*Individually Identifiable Information:* Defendant argued initially that the information contained in the list (name of patient, address of patient, and treating physician) was not information covered by the Privacy Act. The gravamen of the argument was that disclosure of name, address, and treating doctor did not violate the law.

■ There was a time when Defendant's argument might have been viable, but not now. In *United States Department of Defense v. Federal Labor Relations Authority*, 510 U.S. 487, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994), the Supreme Court was asked to deal with an issue that had lead to a variety of lower court decisions. Labor unions representing federal employees wished to seek home addresses of federal employees for organizing purposes. The unions made requests under FOIA for the addresses. The requests were denied on the basis that home addresses were protected under the Privacy Act and not available under FOIA. The Federal Labor Relations Authority directed federal agencies to provide the addresses to the unions. The agencies refused, and enforcement of the order was sought through the United States Court of Appeals for the Fifth Circuit. That court ordered enforcement.

The Supreme Court reversed the order of the Fifth Circuit. The Court held:

> Because the privacy interest of bargaining unit employees in nondisclosure of their home addresses substantially outweighs the negligible FOIA-related public interest in disclosure, we conclude that disclosure would constitute a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). FOIA, thus, does not require the agencies to divulge addresses, and the Privacy Act, therefore, prohibits their release to the unions.

*Id.* at p. 502, 114 S.Ct. at p. 1016. The Court rejected arguments that withholding of addresses would have "a number of untoward effects." The result was that the unions

were not entitled to obtain the home addresses of those who potentially could be recruited to join. *See also, Sheet Metal Workers International Ass'n, Local No. 9 v. United States Air Force*, 63 F.3d 994 (10th Cir.1995); *Federal Labor Relations Authority v. United States Department of Defense*, 984 F.2d 370 (10th Cir.1993).

In this case, the list reflected all patients referred to the Clinic from 1990 on. The list does not differentiate between patients who were on active duty with the Armed Forces, were retired from the Armed Forces, were dependents of active duty personnel, were dependents of retired personnel, or fell into some other category. The prosecution referred the Court to Paragraph 3–3 of Army Regulation 340–21, but this refers to military personal and civilian employees. It does not deal with patients at a military medical facility who are not on active duty.

■ The Court finds, though, the provisions of the Privacy Act are broad and intended to protect information related to individuals. In this case, the medical records maintained at FAMC were covered by the Privacy Act, even for those who were no longer in the employ of the government or were dependents of those on active duty or previously on active duty. The Supreme Court's opinion in *United States Department of Defense* makes clear that home addresses are protected by the Privacy Act. That protection is equally appropriate for those who were patients at the Clinic. Further, no basis has been provided to find that the names of patients and their treating physicians are not also covered by the Privacy Act. Therefore, the information contained in the list constituted "individually identifiable information" that was protected by the Privacy Act.

■ *Knowing Disclosure:* In enacting § 552a(i)(1), Congress provided the language "who knowing that disclosure of the specific material is so prohibited." Defendant argues that this requires the prosecution to establish that he was aware that the specific information should not be disclosed under the Privacy Act or any regulation promulgated pursuant to it. This Court agrees with this argument.

■ Congress' addition of specific language places upon the prosecution a requirement to prove that a defendant knew that specific material could not be disclosed. This element can be proven by either direct or circumstantial evidence. The prosecution chose to present evidence that Defendant had received training and was aware that information held in the computer was protected by the Privacy Act. The prosecution presented the signed Privacy Act statement and a copy of the generic "banner" that flashes on the computer screen each time that it is turned on reflecting applicability of the Privacy Act. The argument is that there need only be a showing of training or a statement of the Privacy Act's applicability. There need not be a showing that Defendant was actually informed about this list specifically being covered by the Privacy Act or that it could not be turned over to Mr. McMullen.

The Court agrees that the knowledge requirement can be shown from previous training or a specific admonition provided as to the general application of the Privacy Act. There was no requirement that a showing be made that Defendant had been specifically provided information about the applicability of the Privacy Act to this list. *See generally, United States v. McGaughey,* 17 M.J. 809 (ACMR 1984); *United States v. Morris,* 17 M.J. 588 (ACMR 1983); *United States v. Amon,* 669 F.2d 1351 (10th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

*Willful Disclosure:* The statute does not define the term "willful disclosure." Defendant argues that the Court must look to civil cases under the Privacy Act for guidance as to what is required for a "willful disclosure." This Court agrees.

The Tenth Circuit has held that "gross negligence" is insufficient to establish civil liability under the Privacy Act. *Andrews v. Veterans Administration of the United States,* 838 F.2d 418 (10th Cir.1988). Other courts have agreed with this general concept. *Tijerina v. Walters,* 821 F.2d 789 (D.C.Cir. 1987); *Moskiewicz v. U.S. Dept. of Agriculture,* 791 F.2d 561 (7th Cir.1986); *Waters v. Thornburgh,* 888 F.2d 870 (D.C.Cir.1989).

"Willful" means something more than gross negligence must be proven to establish civil liability. *See also Wilborn v. Department of HHS,* 49 F.3d 597 (9th Cir.1995) (intentional release of information after supervisor directed administrative law judge not to include information in opinion).

Defendant suggests that the Court can look to *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) for guidance. In that case, petitioner was charged with an alleged violation of 31 U.S.C. 5322(a). The Court held that there must be evidence that petitioner knew the structuring he was involved in was unlawful.

■ In light of everything set forth in § 552a(i)(1), the Court finds that "willful disclosure" requires a showing that a defendant knew the information was protected by the Privacy Act and then voluntarily and purposely disclosed the information in violation of the Act. It would not be a defense that a person chose to ignore all training on the Privacy Act or chose not to read admonitions. A prima facie case can be made on the basis of a defendant having been given the opportunity to learn what is prohibited, voluntarily choosing not to do so, and then voluntarily and purposely releasing protected materials.

### III.

■ The Court has had a chance to review all testimony and applicable law. A number of points are clear to the Court. First, it was not Defendant's idea to secure the computerized list from the Directorate. That idea was Dr. Lisecke's, who then directed Defendant to obtain the list.

Second, there is no doubt in the Court's mind that the list was presented to Dr. Lisecke and remained in his office until it was taken by Mr. McMullen. Third, any discussions with University Hospital staff about the list prior to Mr. McMullen's arrival at the Clinic did not involve Defendant. Fourth, Defendant was unaware that Mr. McMullen would arrive at the Clinic and request the list. Fifth, Defendant had been advised that the list would be turned over to University Hospital for help in preparing a mailing list, as Defendant would not be able to prepare a

mailing list at FAMC because of staff and time constraints. Sixth, Defendant had no further contact with the list or anything to do with it once Mr. McMullen took it. A "flyer" sent to Mr. Matthews at University Hospital by Defendant was out of loyalty to Dr. Lisecke.[6]

The Court finds that the following control the outcome of this case. The statute requires a showing that a person knew that disclosure of specific material was inappropriate. In this case, the prosecution has argued that University Hospital was a third party totally separate from FAMC. The evidence reflects that University Hospital and FAMC had close working relations for years, if not decades. Each was a teaching hospital, with staff and residents rotating through the Clinic, as well as wards at University Hospital. University Hospital staff and residents treated some of the individuals on the list. Indeed, some of the research projects may be continuing today.[7] Thus, University Hospital staff already had access to some of the names, addresses, and treating physicians on the list.

In addition, the evidence before the Court establishes that Defendant was not aware of any improper motive in providing the list to Mr. McMullen. A mailing list could not be produced by Defendant at the Clinic. Dr. Lisecke talked with University Hospital staff about preparing a mailing list. The Court agrees with the prosecution that Dr. Lisecke had a reason for such a mailing list, and that was to provide for himself a ready made practice when he went to University Hospital. There is no basis for believing that Defendant was aware of that motive. For all of the argument that Defendant had some financial motive in getting the list to University Hospital, there is no evidence that he received anything in return. He never did get employment at University Hospital. The job he wanted went to Mr. McMullen, and

there is no evidence he was seriously considered for any position.

The Court further finds that Defendant's turnover of the list was at Dr. Lisecke's direction. From what Defendant knew, and the Court finds Defendant's testimony to be credible, the turnover was premised upon University Hospital doing FAMC a favor by preparing a mailing list. From the testimony of Mr. McMullen and Mr. Matthews, it is clear that Defendant was not part of any decisions concerning the list after it left Dr. Lisecke's office and was given to Mr. McMullen.

The Court finds that the prosecution has not proven beyond a reasonable doubt that Defendant "willfully disclosed" protected material. What has been presented is, at best, gross negligence. That is insufficient for purposes of prosecution under § 552a(i)(1).

■ In addition, there is a reasonable doubt that Defendant knew that the list should not be turned over for purposes of preparation of the mailing list. University Hospital staff was privy to some of the names, addresses, and treating physicians already. There was no other agency to turn to for preparation of a mailing list that would allow the mailing of the letter that Dr. Lisecke had discussed with Defendant and other staff members. It is clear that other lists had been prepared for other clinics where similar concerns existed.

The net result is that the Court has a reasonable doubt that precludes any conviction on this charge. Perhaps Defendant should have checked with Ms. Devonshire or LTC Bursell or someone else before allowing the list to leave. Perhaps LTC Bursell could have monitored the actions of Dr. Lisecke to insure that statements of disqualification were provided to appropriate parties. The

---

**6.** The evidence reflects that Defendant was loyal to Dr. Lisecke, as he had been to others in his military career. Until his general court-martial, Dr. Lisecke was a respected orthopedic surgeon who was engaged in significant medical research. Dr. Lisecke had a faculty appointment at University Hospital and was headed to that prestigious institution after his retirement from the United States Army. There is no evidence

Defendant had any reason to distrust Dr. Lisecke. The person who did have such a reason, LTC Bursell, did not insure that the command monitored the actions of Dr. Lisecke.

**7.** LTC Bursell testified that he was unaware of the final disposition of research projects in which Dr. Lisecke was involved.

simple fact is a lot of things could have been done, but were not.[8]

IT IS HEREBY ORDERED that a finding of Not Guilty is entered in this case, and the charge against Defendant is dismissed with prejudice.

---

**8.** Defendant argued at closing argument that he was the victim of a vindictive prosecution. This Court does not need to reach this issue and will make no comment upon it.